UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY LEVERETTE,

               Plaintiff,                         Case No. 13-10536

                                               Paul D. Borman

v.                                     United States District Judge

GENESEE COUNTY, ROBERT NUCKOLLS,
ROBERT NICKELSEN, THOMAS MULDOON,
JON BECHER, GEORGE ZOFCHAK, and
KYLE GUEST, in their individual and
official capacities,

               Defendants.

_____/

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 39)

      Before the Court is Defendants' Genesee County, Robert Nuckolls, Robert Nickelsen,

Thomas Muldoon, Jon Becher, George Zofchak and Kyle Guest's Motion for Summary Judgment.

(ECF No. 39.) Plaintiff filed a Response (ECF No. 42) and Defendants filed a Reply (ECF No. 44).

The Court held a hearing on May 8, 2014. For the reasons that follow, the Court GRANTS IN PART

and DENIES IN PART Defendants' motion.

**INTRODUCTION**

      This action arises out of Plaintiff's claim that he was pepper sprayed, punched, kicked and

beaten by Genesee County jail officers in violation of his Fourth Amendment rights when he stopped

by the jail on a Saturday afternoon in February, 2011, to use the restroom and to get out of the cold

while waiting for a friend to pick him up.  Plaintiff also claims that Genesee County had a custom

or policy  of failing to train, supervise or discipline jail officers who engaged in acts of excessive

1

force.

Defendants respond that Plaintiff, and the friend who came to pick him up, engaged in disorderly conduct in the lobby of the jail and, once they had exited the building, turned and approached officers in a threatening manner, justifying the use of pepper spray and a certain amount of force to subdue and arrest both Plaintiff and his friend. Defendants deny that they punched, kicked, beat or otherwise engaged in acts of excessive force against Plaintiff. Plaintiff and his friend were arrested and detained overnight. Plaintiff ultimately pled guilty to attempting to engage in an act of disorderly conduct and served 25 days of community service. Plaintiff now brings these claims of excessive force, assault and battery, gross negligence and municipal liability against the Defendants.

For the reasons that follow, the Court DENIES Defendant Nuckolls' motion for summary judgment on Plaintiff's excessive force and assault and battery claims.[1] Further, the Court GRANTS Nickelsen, Muldoon, Guest and the County's motions for summary judgment on Plaintiff's gross negligence claims and DENIES IN PART Nuckolls' motion for summary judgment on Plaintiff's gross negligence claim. Further, the Court GRANTS Defendants Zofchak and Becher's motions for summary judgment because Plaintiff has failed to create a genuine issue of material fact that these two officers failed to intervene to prevent any of the alleged acts of excessive force against Plaintiff, but DENIES Nuckolls' motion for summary judgment on Plaintiff's claim that he failed to intervene. The Court also GRANTS Defendant Genesee County's motion for summary judgment on Plaintiff's

---

[1] At the May 8, 2014 hearing on Defendants' motion, counsel for Defendants informed the Court that Defendants Nickelsen, Guest and Muldoon are no longer seeking summary judgment on the excessive force and assault and battery claims against them due to the issues of fact created by the testimony of Mr. Allen and Ms. Ashby. Nickelsen, Guest and Muldoon continue to seek dismissal of the gross negligence claims against them.

custom or policy claim as Plaintiff has failed to create a genuine issue of material fact that the County had a custom or policy of failing to train, supervise or discipline its officers.

## I.      BACKGROUND

There are two distinct versions of the facts in this excessive force case.  One version of the events of that day is told in the testimony of the Plaintiff, his friend, Gregory Allen who came to pick him up at the jail and Allen's girlfriend, Rose Ashby, who waited in the car in front of the jail while Allen went inside to get the Plaintiff.  Opposing their version of the facts is the testimony of the six Genesee County Sheriff's deputies who were involved in the incident with Plaintiff and Allen on that cold February day in 2011.

### A.      The Testimony of the Plaintiff, Gregory Allen and Rose Ashby

### 1.      Plaintiff

On February 12, 2011, Plaintiff and his ex-wife were riding in a car with Plaintiff's ex-wife's five children on the way to do some grocery shopping when Plaintiff and his ex-wife began to have a disagreement.  (Defs.' Mot. Ex. 1, Sept. 5, 2013 Deposition of Terry Wayne Leverette 73-74.) Plaintiff was upset because his ex-wife sided with the children and refused to present a "united front" when the two of them were addressing parenting issues with her children.  *Id.* at 75.  Before leaving for the grocery store, Plaintiff, who was riding in the passenger seat, had consumed a half glass of Martell cognac and two 24-ounce beers.  *Id.* at 76, 135.  Plaintiff testified that he was "a little buzzed up," but "not drunk."  *Id.* at 77.

Plaintiff's ex-wife decided that Plaintiff should get out of the car so she dropped him off in front of the Flint Police Department and told him to go talk to someone in the police department. *Id.*  The police department was not open so Plaintiff, who by this time also needed to use a restroom,

3

made his way to the Genesee County Jail right around the corner from the police department, where he knew there was a public restroom. *Id*. at 78-79, 82. Plaintiff found the jail doors also locked but someone sitting inside the lobby doors opened them for Plaintiff. *Id*. at 82-83. The individual who was sitting in the lobby and let Plaintiff in was wearing street clothes and looked to Plaintiff like he had just been released and was waiting for a ride. *Id*. at 136.

Plaintiff entered the jail lobby and proceeded to the restroom. He did not see anyone other than the gentleman who let him in who did not appear to be a jail employee and he did not speak to anyone. *Id*. at 83-84. After using the restroom, Plaintiff went back out the lobby doors to wait for his ride. He had called his friend, Gregory Allen, and asked for a ride home from the jail. *Id*. at 89-90. As soon as Plaintiff was outside the building, he realized he that he had left his hat and gloves inside. Luckily, the same gentleman was still sitting in the lobby and let Plaintiff back inside. *Id*. at 84-85, 87. Plaintiff spoke to the individual who let him in and asked if he had seen Plaintiff's hat and gloves. The gentleman responded that he had just seen the cleaning lady pick up a hat and some gloves and place them on her cart. *Id*. at 88. Plaintiff spotted the cleaning lady down the hall and tried to get her attention by asking her for his hat and gloves. She appeared not to hear him and continued down the hallway. *Id*. at 88-89. Plaintiff states that he was not yelling at the cleaning lady but was "trying to get her to hear [him]." *Id*. at 88.

At this point, Plaintiff states, a police officer came around the corner and told Plaintiff to "get the f*** out of my building." *Id*. at 89. Plaintiff states that he tried to explain to the officer that he was trying to get his hat and gloves but the officer insisted that Plaintiff leave the building, which Plaintiff did. *Id*. at 92, 94. Plaintiff's ride still had not arrived and Plaintiff re-entered the building for a third time, again assisted by the same gentleman still seated in the lobby. *Id*. at 91-93, 95-96.

4

Plaintiff was waiting inside the building when Mr. Allen arrived.  Plaintiff let Mr. Allen in the lobby and "almost immediately" three or four officers "showed up" in the lobby.  *Id*. at 96-99.

Mr. Allen approached the officers and told them that they "at least" could give Plaintiff back his hat and gloves.  *Id.* at 99.  Plaintiff had no recollection that Mr. Allen was using profanity or shouting at the officers.  Plaintiff was not saying anything to officers at this point, and told Mr. Allen they should just "forget the hat and gloves" and leave.  *Id*. at 100.  Plaintiff and Mr. Allen exited the lobby doors and the officers followed them out.  *Id*. at 104-05.  Plaintiff remembers Mr. Allen turning around and saying to the officers, "You all at least could have gave the man . . ." and then officers "started macing" both Mr. Allen and Plaintiff, who was standing behind Mr. Allen.  *Id*. at 105, 141-42.  Plaintiff testified that no verbal warnings or announcements that Plaintiff was under arrest were given by any of the officers at any time during the altercation.  *Id*. at 151.  Plaintiff did not recall Mr. Allen approaching one of the officers and saying "f*** you, this is a free country," or anything like that.  Plaintiff did not deny that Mr. Allen said that, he just could not recall.  *Id*. at 106-07.  Plaintiff states that as soon as he and Mr. Allen were sprayed in the face, the officers started "swinging" and took Plaintiff down "immediately."  *Id*. at 109.  Plaintiff does not recall exactly how many officers were dealing with him but he thought there may have been at least four.  *Id*. at 110.  Plaintiff states that he was lying face down, trying to cover his head and officers were punching and kicking him from his legs to the top of his head and hitting him with a hard object.  *Id*. at 112, 141-43.  Plaintiff does not recall then being handcuffed and does not remember anything else until waking up in a jail cell alone.  *Id*. at 113-14.

Plaintiff took a shower, washed his eyes and spent the rest of the weekend in jail.  *Id*. at 114-15.  Booking photos show Plaintiff had black, bruised, swollen eyes.  (Pl.'s Resp. Ex. L).  Plaintiff

was examined by a nurse the day after the incident while still in jail.  (Pl.'s Dep. at 117.)  The
2/13/2011 Report  indicated that there was "bruising to both eyes," "swelling of both eyes," and
"blood noted in the conjunctival space" of Plaintiff's left eye.  (Pl.'s Resp. Ex. N.)  Plaintiff did not
seek independent medical attention for his injuries until several months after his arrest because he
was "licking his wounds" and being "macho."  (Pl.'s Dep. at 118-19, 148.)  Plaintiff claims that he
has continuing problems with his rotator cuff and has low back pain, in addition to eyes that "tear
up constantly," as a result of the alleged "macing" and beating.  *Id*. at 145-46.  Plaintiff did have a
small hammer in his coat pocket that he carries with him "for protection."  *Id*. at 86, 156-57.

Plaintiff was ultimately charged with disorderly conduct and, on his attorney's advice, pled
guilty to attempted disorderly conduct.  *Id*. at 115; Defs.' Mot. Ex. 7, 68th District Court Docket,
8/30/2011 Plea Date on Count I, Attempted Disorderly Person Disturbing the Peace, Amended From
Disorderly Person Disturbing the Peace, Plead Guilty.  Plaintiff told an examining psychologist that
he pled guilty because he was a registered foster father and a detective told him if he didn't plead
guilty, he would lose his foster children.  (Pl.'s Resp. Ex. M, March 24, 2012 Report of Firoza B.
Van Horn, Clinical Psychologist 2.)

Plaintiff was sentenced to 25 days community service at a soup kitchen.  At the plea hearing
before Judge M. Cathy Dowd on August 30, 2011, the following colloquy took place between
Plaintiff and the Court:

| | |
|---|---|
| The Court: | Then as to the charge that on or about the 17th - no, 'scuse me - 12th day of February, 2011, while in the City of Flint, Genesee County, Michigan, you did make or excite (sic) a disturbance in a building located at 1002 South Saginaw Street, how do you wish to pled? |
| Plaintiff: | Your Honor, it would be an attempt. |
| The Court: | Yeah. Okay. |
| Plaintiff: | Thank you. |
| The Court: | I'm sorry.  Attempt to makin' a disturbance, how do you wish to |

|            | plead?                                                                      |
|------------|------------------------------------------------------------------------------|
| Plaintiff: | Guilty.                                                                       |
|            | *                          *                          *                      |
| The Court: | And in fact you were at the county jail?                                      |
| Plaintiff: | Yes Your Honor.                                                               |
| The Court: | And you did attempt to incite some kind of disturbance?                       |
| Plaintiff: | Yes Your Honor.                                                               |
|            | *                          *                          *                      |
| The Court: | Okay. Well, you have to pay the $48.00 in cash so it'd be 25 hours Sheriff's Work Detail starting September 6th, 2011, at 5:45 in the morning. Go to the lobby of the jail – |
| Plaintiff: | Ooh, they beat me up pretty bad down there, you know.                         |
| The Court: | The deputies did?                                                            |
| Plaintiff: | Yes, Ma'am.                                                                   |
| The Court: | Okay. So, I can understand you might not wanna do it so it's one or the other and you don't have the income to do the other, so, now, what am I gonna do with ya? |
| Plaintiff: | Like, community service some place else?                                      |
|            | *                          *                          *                      |
| The Court: | 'Kay. You can do 25 hours at the North End Soup Kitchen. How's that?          |
| Plaintiff: | That's fine.                                                                  |
| The Court: | You've got until November 8th to finish that and to pay your $48.00 in cash. If not, you'll spend 10 days in the county jail, no day for day, no trust status and, from what you've just said, I guess you've got high enticement, right, not to go back there. |
| Plaintiff: | Yes Ma'am.                                                                    |

Defs.' Reply Ex. A, Transcript of August 30, 2011 Plea Hearing 4-7.

## 2.  Gregory Allen

Plaintiff's friend, Gregory Allen, testified that on the day of the incident, Plaintiff called and asked for a ride home from the county jail where he had been dropped off without transportation. (Defs.' Reply Ex. B, February 12, 2014 Deposition of Gregory O. Allen 14.)  Allen and his girlfriend, Rose Ashby, drove to the county jail and pulled their car up in front of the building. Ms. Ashby stayed in the car with her baby while Allen went up to the jail to get Plaintiff. *Id.* at 18-19. Allen testified that Plaintiff let him in the lobby doors and explained to Allen that he was waiting

for the cleaning lady to get his hat and gloves. *Id*. at 19. Allen states that he proceeded directly to the restroom and when he walked back out into the lobby, there were several deputies talking to Plaintiff who was explaining that he was waiting for the cleaning lady, who had his hat and gloves. Plaintiff was not being at all aggressive. *Id*. at 20, 51-54. Allen testified that he accidentally bumped one of the deputies as he was walking by and the deputy said, "you know, that could be deemed as assault." *Id*. at 22. Allen said "yeah, right," took a seat, waited a few minutes and, when he felt the conversation was getting a little "snide" and "confrontational," he told Plaintiff he was "not gonna be in this," and would wait outside in the car. *Id*. at 20, 22. Allen states that at this point, when he walked out the lobby door and got about halfway to the car where his girlfriend was waiting, one of the deputies said "hey," and when Allen turned around, they sprayed "mace" in his eyes and threw him on the ground. *Id*. at 20-22. Allen testified that the only reason he had come to the jail was to pick up his friend and it seemed to him like the deputies were "trying to escalate a situation that [he] wasn't going to feed into." *Id*. at 28.

Allen denied that he said "F*** you, this is a free country," or anything like that to the officers. *Id*. at 30. After he was sprayed in the face, he followed commands to get on the ground and put his arms out. An officer "stomped on [his] watch and broke it," and they proceeded to handcuff him. He did not resist or fight. *Id*. at 31. Allen testified that none of the officers punched or hit him but that he did notice Plaintiff in an altercation with officers and observed "lots of arms flailing" and "arms going up and down like they was hitting Plaintiff." *Id*. at 40, 58. Allen could tell when he saw Plaintiff's face that "he got beat up pretty bad." *Id*. at 40, 60-61. Allen thought that there were three or four officers dealing with him and about that many surrounding Plaintiff. *Id*. at 40.

Allen testified that he was released from jail the next day and was unaware that charges were being pressed against him until a couple of months later when Plaintiff told him that there were warrants out for both of their arrests as a result of the altercation on February 12, 2011. *Id.* at 33. Allen testified that he went to court three different times before anyone could tell exactly what he had been charged with and that he refused to plead guilty to anything "because [he] didn't commit any crime." *Id.* at 34. Ultimately, the charges were dismissed and it was never clear to him what crime he had been charged with committing. *Id.* at 35.

### 3.     Rose Ashby

Allen's girlfriend, Rose Ashby, testified that she waited in the car for Allen to go up to the jail to get Plaintiff and she saw the altercation between Plaintiff, Allen and the officers. (Defs.' Reply Ex. C, February 12, 2014 Deposition of Rose Ashby 16.) She testified as follows as to her observations:

> Q.      Okay. Did you stay in the car?
> A.      Yes, because I had the baby in the car with me.
> Q:      And you never left the car?
> A:      I got out of the car – me and the baby got out when I saw an altercation outside. And Greg and [Plaintiff] was on the ground, and the police was kicking them and beating them and everything.
>
> And I got out and I'm yelling, I'm like, "What are you doing? What's going on? And that's when they got them up off the ground and they took them inside.
>
> So I got the baby out of the truck, and we rang the bell. And it took forever for them to come and let us in. And I'm like "What's going on?" They said "Mr. Allen is under arrest for assault and battery" or something and they said. And I'm like, "For what?"
>
> Because when he came out, he was looking at his cellphone. When he came out, he was just walking, you know. And I'm – you know, and I told the baby, I said, "Here comes Daddy," you know.
>
> And the next thing I know, they were on the ground getting kicked and hit –

Ashby Dep. 16.

Ms. Ashby testified that Allen was in the building maybe ten minutes when he and Plaintiff

9

came out, followed by officers. She could hear Plaintiff saying, "I want to get my gloves." *Id*. at 20. And the next thing she knew both Plaintiff and Allen were "on the ground" and were "being kicked and punched." *Id*. at 21. She testified that "they were beat" and "held down," and Plaintiff was yelling, "what are you doing," and "stop hitting me," and "it was all just crazy." *Id*. at 21, 37. She testified that none of the deputies was saying anything except "get down" and that neither Allen nor Plaintiff was resisting. *Id.* She specifically testified that she "saw [officers] kicking them and hitting them with their fists and everything." *Id*. at 22. She did not hear Allen say "f*** you," or "I'm a free person," or anything like that. *Id*. at 37.

### B. The Testimony of the Defendant Officers

### 1.    Deputy Robert Nickelsen

Deputy Robert Nickelsen was the first to approach Plaintiff in the lobby of the jail on February 12, 2011. (Defs.' Mot. Ex. 2, September 9, 2013 Deposition of Robert Nickelsen 4, 12-13.) On that date, Nickelsen had been with the Genesee County Sheriff's Department for four and a half years, having attended the City of Flint Police Academy in 2005. *Id*. at 5-6. Nickelsen had never been reprimanded, suspended and had never received a citizens' complaint or excessive force claim against him. *Id. at 6-7*. Nickelsen explained that in February, 2011, and on the day of the incident with Plaintiff, none of the jail deputies was authorized to carry a weapon, baton or ASP. They were permitted to carry only OC Spray. *Id*. at 8. Now, such deputies are authorized to carry tasers and OC Spray. *Id*. Nickelsen explained that the lobby is closed and locked on the weekends and that there is no one on duty at the visitor desk on weekends. Visitors seeking entrance to the jail on weekends have to buzz to be granted entry. *Id*. at 8-10.

On the day of the incident with Plaintiff and Mr. Allen, Nickelsen was informed by his then

immediate supervisor, Sergeant Nuckolls, that there was a disturbance of some kind in the lobby of the jail. *Id*. at 12. He was informed by Nuckolls that "there were a couple of guys in the lobby acting disorderly." *Id.* When Nickelsen entered the lobby area, Plaintiff was seated and was yelling out loud "give me my gloves." *Id*. at 13. Nickelsen conceded that at that point in time, just sitting in the lobby loudly asking to be given his gloves, Plaintiff had not committed any crime. *Id*. at 14. As Nickelsen approached to speak with Plaintiff, Mr. Allen came around the corner from the restroom and stood within a few inches of Nickelsen. *Id*. at 17. Plaintiff was seated at the time and Nickelsen was not paying attention to Plaintiff as he started giving Allen verbal commands to back away from him. *Id*. at 18. At that time, according to Nickelsen, Allen "began flailing his arms and he says something about it's a free country." *Id*. Allen never swung at Nickelsen but was making "really large arm motions." *Id.* Allen "reluctantly backed away" and Nickelsen asked both Allen and Plaintiff to leave the building. *Id*. at 19, 21. Other than yelling for his gloves, Plaintiff did not exhibiting any other aggressive behavior. *Id*. at 22. Allen started to leave the building and Plaintiff followed behind him. *Id*. at 23. Nickelsen stated that he proceeded out the lobby doors behind Plaintiff and Allen to "make sure they were leaving." *Id*. at 26. Nickelsen believed that at that point four other officers had joined him – Nuckolls, Guest, Muldoon and Becher. *Id*. at 29.

Nickelsen recalled that when Plaintiff and Allen had walked away and were about 10 feet from the lobby doors, they turned and started coming back toward the group of deputies. Allen turned first and Plaintiff followed him. *Id*. at 30-31. Nickelsen testified that he gave Allen verbal orders to stop which Allen ignored and instead kept walking toward officers with his fists clenched "talking about free country" and "he has rights." *Id*. at 33. His fists were down by his sides and he appeared to Nickelsen to be becoming aggressive. *Id*. at 34. Nickelsen did not recall Plaintiff

clenching his fists or yelling anything at the deputies.  *Id*. at 36.  Nickelsen was focused on Allen the entire time and only after Allen was secured did Nickelsen look over to see what was going on with Plaintiff, at which time he observed Deputy Muldoon in a struggle with Plaintiff trying to handcuff Plaintiff and observed Sergeant Guest attempting to help while Plaintiff resisted efforts to handcuff him.  *Id*. at 38.  Nickelsen testified that Deputy Becher helped him to arrest Allen.  *Id*. at 40-41.  Nickelsen then assisted Muldoon and Guest in securing Plaintiff in handcuffs.  *Id*. at 41-42.  Nickelsen testified that at the time he moved in to help Muldoon and Guest, there would have been no reason for any of the officers to have punched or kicked the Plaintiff.  *Id*. at 43-44.  Nickelsen never observed any of the other officers hit, punch or kick the Plaintiff.  *Id*. at 44.

Nickelsen's Report was consistent with his testimony that he was alerted by Sergeant Nuckolls that two males were in the lobby acting disorderly.  (Defs.' Mot. Ex. 9, Incident Reports p. 3.)  Nickelsen reported that deputies Becher, Muldoon, Zofchak and he responded and encountered Plaintiff yelling, "give me my gloves."  *Id*.  Nickelsen reported that Allen passed near him and smelled of alcohol and had blood shot and glassy eyes.  When told to back away, Allen stated that he was a free man and "didn't have to do sh**."  *Id*.  After having been given several orders to back away and leave the property, Allen and Plaintiff complied.  The officers followed Allen and Plaintiff outside the building and, once outside, Allen approached Nuckolls aggressively with his fists clenched at his sides and shouted that it was a free country.  Nuckolls delivered an approximately 3 second burst of pepper spray hitting both Allen and Plaintiff in the face.  *Id*.  Nickelsen and Becher took Allen to the ground and Allen continued to resist by flailing his arms and grabbing at deputies.  Deputies forced Allen's hands behind his back and handcuffed him without further incident.  *Id*.  Nickelsen then observed deputy Muldoon in a struggle with Plaintiff and

assisted in forcefully placing Plaintiff's hands behind his back and handcuffing Plaintiff. Both Plaintiff and Allen were advised they were under arrest for assault and battery and were lodged in the Genesee County Jail. *Id.* at p. 4.

### 2.    Sergeant Robert Nuckolls

Sergeant Robert Nuckolls had been with Genesee County Sheriff's Department 20 years at the time of the incident in February, 2011. (Defs.' Mot. Ex. 3, September 9, 2013 Deposition of Robert Nuckolls.) Nuckolls had never had a citizen complaint or an excessive force claim lodged against him. *Id.* at 6-7. Nuckolls testified that he had never had to discipline any of the other Defendants. *Id.* at 13-14. Nuckolls instructed officers on the use of force and testified to his understanding of the use of force principle that officers may only employ the amount of force necessary. *Id.* at 15-17.

Nuckolls was called to respond to the disturbance in the lobby and collected several deputies to accompany him. *Id.* at 28. Nuckolls testified that neither he nor any of the officers was armed and he carried only pepper spray. *Id.* at 30. Nuckolls testified that once outside the building, Allen turned and approached him with Plaintiff following behind. *Id.* at 21. It was not until they got outside that "the real incident" began. *Id.* at 39. Nuckolls testified that nothing that Allen or the Plaintiff had done inside the building would have justified arresting them for disorderly conduct. *Id.* at 39-40. When they stepped outside, Allen said something about being a free man or this being a free country and then turned and "puffed up" and "balled his fists" and came within a foot of Nuckolls. *Id.* at 41, 44. Allen did not put up a fighter's stance but "got up in [Nuckolls] reactionary gap." *Id.* at 44. Nuckolls testified that there was "no time" to give verbal commands before he deployed his pepper spray into Allen's and Plaintiff's face. *Id.* at 44-45, 50. Nuckolls did not recall

13

Plaintiff making any moves of any kind other than turning around with Allen, a few steps behind him, and also approaching the officers. *Id*. at 47. Nuckolls did not thereafter touch either Plaintiff or Allen but did observe Nickelsen, Muldoon and Guest struggling with Plaintiff on the ground and noted that Plaintiff was "resistant to the handcuffing process." *Id*. at 49, 51, 56. Other than deploying his pepper spray, Nuckolls was not involved in subduing Allen or the Plaintiff. *Id*. at 52. Nuckolls saw no necessity for any of the officers to have punched the Plaintiff. *Id*. at 52-53. No statements were taken from any other witnesses who may have been in the lobby at the time. *Id*. at 34. Nuckolls conceded that if Plaintiff and Allen had just turned back toward the group of officers and started yelling about their rights it would have been inappropriate to have deployed his pepper spray. *Id*. at 54. But because Plaintiff was "closing the gap" behind Allen, Nuckolls felt justified in deploying his pepper spray in both of their faces. *Id*. at 55.

Nuckolls' report similarly states that he was called to the jail lobby after complaints about a disturbance and that once outside Allen turned toward Nuckolls with his fists clenched yelling and screaming at which point Nuckolls utilized his pepper spray to "end the threat." (Defs.' Mot. Ex. 9, Incident Reports 1.) Nuckolls reports that "staff then took him to the ground for handcuffing." *Id*. Nuckolls states that while staff were engaged with Allen, Plaintiff attempted to "grab" Becher and Nickelsen and deputy Muldoon took Plaintiff to the ground and handcuffed him. *Id*.

### 3.    Deputy George Zofchak

Deputy George Zofchak had been employed by the Genesee County Sheriff's Department for approximately six years at the time of the 2011 incident. (Defs.' Mot. Ex. 4, September 10, 2013 Deposition of George Zofchak 5.) Zofchak had never been accused of an act of excessive force and had received training on the use of force continuum. *Id*. at 6-7. Zofchak was working in booking

on the day of the incident when he received a call that there were "two guys creating a problem in the lobby." *Id*. at 9.  Zofchak proceeded to the lobby area and saw a woman and a small child whom he removed from the area.  *Id*. at 10.  Zofchak said he knew that Allen and the Plaintiff had been being disorderly because the female bystander was the person who had called into the booking room to say that the two men in the lobby were creating a problem.  *Id*. at 11-12.  This woman's statement never made it into the police report and her statement was never obtained.  *Id*. at 12, 19.  Once outside the building, Zofchak immediately assisted in bringing Allen under control by placing a knee in Allen's back and had no interaction whatsoever with the Plaintiff and was not paying attention "at all" to what was happening with Plaintiff.  *Id*. at 14, 17-18, 21.

Zofchak's report was similar.  He was called to the lobby area because of a report that two individuals were causing trouble and escorted a lady and a small child away from the lobby to the Visitor Screening Area.  (Defs.' Mot. Ex. 9, Incident Reports 6.)  Zofchak then went outside to assist the other deputies and noted that Allen and Plaintiff were on the ground being handcuffed.  *Id*. Zofchak went to assist with Allen who "was not following the instructions given by the deputy," and placed his knee on Allen's back between his shoulder blades so that the other deputies could handcuff Allen.  *Id*.  Both Allen and Plaintiff were escorted inside the jail and booked.  *Id*.

### 4.    **Deputy Thomas Muldoon**

Deputy Thomas Muldoon had been with the Genesee County Sheriff's Department approximately three years at the time of the February, 2011 incident with Plaintiff.  (Defs.' Mot. Ex. 5, September 9, 2013 Deposition of Thomas Muldoon 6.)  Deputy Muldoon was in booking that afternoon and was summoned by Nuckolls and Sergeant Guest to assist with escorting two men out of the lobby.  *Id*. at 16.  Muldoon did not have any weapons or pepper spray on him because at that

time only supervisors carried pepper spray and none of the staff were permitted to have tasers or weapons of any kind. *Id*. at 17.  Muldoon testified that "once [individuals] leave the building, they are no longer a threat to us or a problem." *Id*. at 18.  Muldoon did recall seeing a woman with a child  in the lobby. *Id*. at 21.  Muldoon first saw Allen and Plaintiff inside the lobby and recalled that one of them was mumbling something.  *Id*. at 23.  Muldoon understood the use of force continuum from police presence, to verbal commands to whatever force is necessary up to one step above the force or resistance being offered. *Id*. at 23-24.  Muldoon testified that Allen and Plaintiff walked out the lobby doors and were probably 10 feet from the doors when they turned back and "said something." *Id*. at 30.  He had other deputies in front of him and could not see everything that was going on but he testified that once Plaintiff and Allen were outside the lobby doors there was no reason to keep following until they became a problem again, which they did when they turned and came back towards the doors.  *Id.* at 32.  Allen was out in front and Plaintiff was following behind. *Id*.  Muldoon told Plaintiff "several times in a loud, clear voice," to stop where he was and he kept coming toward the deputies. *Id*. at 33-34.  Muldoon was focused on subduing Plaintiff whom he had observed being pepper sprayed in the face by Nuckolls. *Id*. at 35-36.  Muldoon was the first officer to make contact with Plaintiff and he grabbed Plaintiff's right arm and did a "straight arm takedown." *Id*. at 37.  At that point, according to Muldoon, Plaintiff pulled his right arm away and reached into the left inside coat pocket of his jacket with his right hand. *Id*. at 38.  At this point, Muldoon swept Plaintiff's legs out from under him to take him down to the ground, not knowing what Plaintiff might be reaching for in his pocket. *Id*. at 38.  Muldoon landed on the ground next to Plaintiff who continued to resist and kept trying to pull his arm away from Muldoon. *Id*. at 41-42. At this point, Sergeant Guest approached and assisted Muldoon to secure Plaintiff's right arm and

16

get his hands behind his back.  *Id*. at 43.  Nickelsen then came over to assist in placing handcuffs on Plaintiff.  *Id*.  Muldoon stated that he delivered a "common peroneal knee" strike to Plaintiff's peroneal nerve area to gain control but otherwise did not punch or kick Plaintiff.  *Id*. at 45-46. Muldoon stated that he was justified in the amount of force he used because Plaintiff continued coming towards him after having been given and ignoring verbal commands to stop.  *Id*. at 47.

Muldoon's report was similar.  He reported that both Allen and Plaintiff were in the jail lobby and were being disruptive and both had the smell of alcohol on their breath.  (Defs.' Mot. Ex. 9, Incident Reports 1.)  He stated that both Allen and Plaintiff continued to be belligerent as they were being escorted out of the lobby.  *Id*.  At this point, once outside, they turned on officers and Nuckolls administered a burst of OC spray.  Deputy Becher and Nickelsen took Allen to the ground and Plaintiff "started toward deputies Becher and Nickelsen."  *Id*.  At this point, Muldoon grabbed Plaintiff by the right arm and attempted a right arm takedown but Plaintiff pulled away and reached towards his left pocket.  *Id*. at 2.  Muldoon grabbed his right arm and swept his legs in order to take him to the ground.  Plaintiff then refused orders to place his arms behind his back and force was used to place Plaintiff in handcuffs behind his back.  Plaintiff was informed he was being arrested for assault and battery and upon pat down Muldoon discovered a small hammer in Plaintiff's left coat pocket.  *Id*. at 2.

### 5. Sergeant Kyle Guest

Sergeant Kyle Guest started working at Genesee County Sheriff's Department in 1995. (Defs.' Mot. Ex. 6, September 6, 2013 Deposition of Kyle Guest 7.)  Guest recalled once before having been accused of excessive force for breaking a woman's arm, and was suspended, but ultimately was cleared of the charges.  *Id*.  Guest believes he was the last officer to respond on that

day in February, 2011, and did not see anything that occurred previous to the incidents outside in front of the building. *Id*. at 16. Guest proceeded directly to the assistance of Muldoon who was by himself and engaged with Plaintiff on the ground. *Id*. at 20. Muldoon was struggling to get Plaintiff's arms which were underneath Plaintiff's body. *Id*. at 21. Guest stated that Plaintiff was "a pretty big guy" and they were having trouble trying to get him handcuffed. *Id*. at 22. Guest could not testify as to whether Muldoon had punched or kicked or hit Plaintiff because he was not out there. *Id*. at 23. Guest testified that it would not have been necessary to punch, hit or kick Plaintiff after the time that Guest arrived on the scene and that any such use of force would have been excessive. *Id*. at 25-26.

### 6.     Deputy Jonathan Becher

Deputy Jonathan Becher began working at the Genesee County Sheriff's Department in August, 2008. (Defs.' Mot. Ex. 8, September 10, 2013 Deposition of Jonathan Becher 5.) Becher received training in the use of force continuum. *Id*. at 6-7. Becher was dispatched to go to the lobby of the jail on February 12, 2011 to help remove two individuals who had been disorderly. *Id*. at 12. One of his supervisors, either Guest or Nuckolls, ordered him to go to the lobby to help remove Allen and Plaintiff. *Id.* Becher did not speak to or have any physical contact with Allen or the Plaintiff inside the building in the lobby. *Id*. at 13. Becher did not recall Allen or Plaintiff being belligerent to officers but they were being disorderly, talking loudly and swearing. *Id*. at 15. Allen and Plaintiff left the lobby area on their own and were not physically escorted out of the building. *Id*. at 17. All of the officers involved followed Allen and Plaintiff out of the building maybe 10 feet onto the sidewalk. *Id*. at 18-19. Becher recalled that Nickelsen, Muldoon, Zofchak, Guest and Nuckolls were present. *Id*. at 21. Out on the sidewalk, Allen turned around and was "in almost like

18

a fighting position and walked back toward Sergeant Nuckolls." *Id*. at 22.  Plaintiff was following right behind him.  *Id*.  Allen looked to Becher like he wanted to fight.  *Id*. at 22-23.  Becher agreed that officers would have to be threatened in some way, such as by an aggressive fighting stance, in order to justify the use of force.  *Id*. at 23.  Becher did not personally verbally command Allen and Plaintiff to stop but assumed someone did although he could not recall specifically who did so or what they said.  *Id*. at 24-25.  Becher was involved with responding to Allen and had no involvement with Plaintiff.  *Id*. at 27.  Becher did not know "anything" about Plaintiff and was focused only on Allen.  *Id*.  at 27-28.  Becher was the first one to grab Allen and attempted a common peroneal knee strike to his outer leg, not with his foot but with his knee.  *Id.* at 28-29.  The knee strike was ineffective and ultimately, with the assistance of Nickelsen, they were able to take Allen to the ground.  *Id*. at 29.  Deputy Zofchak also came to assist with Allen and placed his knees in Allen's back.  *Id*. at 29-30.  Becher did not see anyone approach Plaintiff and was never close enough to Plaintiff to be aware of what was happening to Plaintiff.  *Id*. at 30.  He did not know whether anyone punched, kicked or hit Plaintiff and had no contact at all with Plaintiff.  *Id*. at 31.

Becher's Report was similar.  He noted that Plaintiff had been asked several times to leave the lobby and he witnessed Nickelsen ask both Plaintiff and Allen to leave the lobby building.  (Defs.' Mot. Ex. 9, Incident Reports 5.)    Allen refused all orders given and walked towards Nickelsen flailing his arms and swearing.  Nickelsen warned both Allen and Plaintiff that they would be arrested if they didn't leave the building and the two slowly left the building.  *Id*.  As Becher was standing outside the lobby doors, Allen turned aggressively toward Nuckolls with his fists clenched and yelled, "F*** you, this is a free country."  *Id*.   Nuckolls administered his OC spray and Becher attempted to take Allen to the ground with a peroneal knee strike.  Once on the ground, Allen

19

continued to resist and Becher and Nickelsen forced Allen's hands behind his back and handcuffed him. *Id*.

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the

non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324. "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In doing so, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed.

R. Civ. P. 56(c)(1)(A).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex*, 477 U.S. at 323-34.

The Supreme Court recently reiterated, in a rare decision reviewing the factual sufficiency of a § 1983 excessive force claim, the importance of applying the summary judgment directive that the evidence be viewed in the light most favorable to the non-moving party. In *Tolan v. Cotton*, 134 S.Ct. 1861 (2014) (per curiam), the Court vacated the judgment of the Fifth Circuit Court of Appeals which had affirmed the district court's grant of qualified immunity on summary judgment to police officers on plaintiff's claims of excessive force. The Court observed:

> Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard. In cases alleging unreasonable searches or seizures, we have instructed that courts should define the "clearly established" right at issue on the basis of the "specific context of the case." *Saucier*, *supra*, at 201; *see also Anderson v. Creighton*, 483 U.S. 635, 640–641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions. *See Brosseau [ v. Haugen,* 543 U.S. 194, 195, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)] (inquiring as to whether conduct violated clearly established law "'in light

of the specific context of the case' " and construing "facts ... in a light most favorable to" the nonmovant).

In holding that Cotton's actions did not violate clearly established law, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case. By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly "weigh[ed] the evidence" and resolved disputed issues in favor of the moving party, *Anderson*, 477 U.S., at 249.

*          *          *

The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

134 S. Ct. at 1866, 1868.

## III.   ANALYSIS

### A.   Excessive Force - 42 U.S.C. § 1983

Claims regarding an officer's use of excessive force in the context of an arrest or other seizure are governed by the Fourth Amendment:  "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  *See also Shreve v. Franklin County, Ohio*, 743 F.3d 126, 133 (6th Cir. 2014) (reaffirming that a claim asserting the use of force in the course of an arrest "arises under the Fourth Amendment and its reasonableness standard.");  *Malory v. Whiting*, 489 F. App'x 78, 82 (6th Cir. 2012) (citing *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009)) ("The Fourth Amendment of the United States Constitution protects a person from being subject to excessive physical force during the course of an arrest, a booking, or other police seizure.").  The determination as to whether the officer

has exerted excessive force during the course of seizure is determined under an "objective reasonableness" standard. *Graham*, 490 U.S. at 396-97. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. The Court analyzes the challenged conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. The Sixth Circuit recently summarized the analytical framework applied in an excessive force case:

> Under the Fourth Amendment, we apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865. We balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). In doing so, three factors guide our analysis: "'[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (*quoting Graham*, 490 U.S. at 396, 109 S.Ct. 1865). These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

*Burgess v. Fischer*, 735 F.3d 462, 472-73 (6th Cir. 2013) (alterations in original).

The reasonableness inquiry necessarily entails balancing individual rights with governmental interests:

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries

24

> with it the right to use some degree of physical coercion or threat thereof to effect it.
> . . . Not every push or shove, even if it may later seem unnecessary in the peace of
> a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness
> must embody allowance for the fact that police officers are often forced to make
> split-second judgments – in circumstances that are tense, uncertain, and rapidly
> evolving – about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97 (internal quotation marks and citations omitted).

Civil liability will not attach, however, simply because an officer's conduct may be found to have violated one or more of a plaintiff's constitutional rights. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __U.S.__, 131 S.Ct. 2074, 2080 (2011). A court need not address these two inquiries in any particular order, and may choose first to determine whether a right was clearly established before deciding whether an officer's conduct on a particular occasion violated that right. *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S.Ct. at 2083 (internal quotation marks, citation omitted) (alterations in original). "'If the law at that time was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 960 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The Sixth Circuit has noted that: "The sources of clearly established law to be considered are limited. We look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Martin*, 712 F.3d at 961

25

(internal quotation marks and citation omitted). In defining the contours of a right to determine whether it was clearly established at the time of the challenged conduct, a court cannot "generalize too much," nor can it "generalize too little." *Martin*, 712 F.3d at 960 (internal quotation and citation omitted). The precise factual scenario under consideration need not necessarily have been directly addressed in a prior decision:

> The task, then, is not to match each application of force with a precisely analogous case to demonstrate its prohibition. The mere fact that a court has not held the particular action in question unlawful is insufficient to create immunity. An action's unlawfulness may be plain from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs. So while the contours of a right must be sufficiently clear, a fundamentally similar or materially similar case is not required to show it is clearly established.

*Martin*, 712 F.3d at 960-61 (internal quotation marks and citations omitted).

If multiple officers are alleged to have violated a plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed individually. "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Binay*, 601 F.3d at 650 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). "As a general matter, [an officer's] mere presence during [an] altercation, without a showing of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475. If an officer does not directly participate in the challenged conduct, "there must be a showing that they either supervised the [officers] who did so or owed [the plaintiff] a duty of protection." *Id*. To establish that an officer not directly involved owed a duty of care, it

26

must be shown that the officer "observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Id.* (quoting *Turner*, 119 F.3d at 429.)  In determining whether an officer had both the opportunity and the means to intervene, the Court must determine that the incident being challenged lasted long enough for the officers to "both perceive what was going on and intercede to stop it." *Id*.

### B.    Plaintiff's Excessive Force Claims are not Barred by *Heck v. Humphrey*

Defendants suggested in their motion and reply that Plaintiff's guilty plea to attempted disorderly conduct bars his § 1983 excessive force claim under the principles established in *Heck v. Humphrey*, 512 U.S. 477 (1994).  At the hearing on the motion, Defendants' counsel did not argue this point and it appears that Defendants have abandoned this argument.  In any event, *Heck* would not bar Plaintiff's claims in this case.  *Heck* holds, in pertinent part, that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 486-87 (footnotes omitted).

By way of illustration of a case in which a § 1983 action would not directly attack the state

27

court conviction but nonetheless if successful would necessarily imply the invalidity of the state court conviction, the Court in *Heck* offered the following example:

> An example of this latter category—a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful—would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest. (This is a common definition of that offense. *See People v. Peacock*, 68 N.Y.2d 675, 505 N.Y.S.2d 594, 496 N.E.2d 683 (1986); 4 C. Torcia, Wharton's Criminal Law § 593, p. 307 (14th ed. 1981).) He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata, *see* n. 2, supra, the § 1983 action will not lie.

512 U.S. at 487 n. 6.

Thus, to come within the *Heck* exception on an excessive force claim, either (1) the criminal provision must make the lack of excessive force an element of the crime or (2) excessive force must be an available affirmative defense to the crime. *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010). In analyzing an excessive force claim under *Heck*, "the court must look both to the claims raised under § 1983 and to the specific offenses for which the § 1983 claimant was convicted." *Id*. "The mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant if the two are consistent with each other." *Id*. The underlying inquiry is whether "the § 1983 suit seeks a determination of a fact that, if true, would have precluded the conviction." *Id*.

Defendants present no evidence in this case that lack of excessive force is an element of the crime to which Plaintiff pled guilty, i.e. attempting to engage in disorderly conduct. Nor is there evidence that the officers' use of excessive force would have been an available defense to the charge of attempting to engage in disorderly conduct. It was established in *Schreiber* that the *Heck* analysis

28

in this context requires a "precise inquiry" into "both the claims raised under § 1983 and to the specific offenses for which the § 1983 claimant was convicted."  596 F.3d at 334.  "The mere fact that the conviction and the § 1983 claim arise from the same set of facts is irrelevant if the two are consistent with one another."  *Id.*  If the Plaintiff were to succeed in establishing that the use of pepper spray on him or the allegedly gratuitous punches and kicks delivered in the course of his arrest were excessive under the circumstances, this would not necessarily imply that he had not attempted to engage in disorderly conduct in continuing to yell for his hat and gloves and/or turning toward officers once outside the building.  Under these circumstances, success on Plaintiff's § 1983 excessive force claim would not necessarily imply the invalidity of his state-court conviction for attempting to engage in disorderly conduct and *Heck* does not bar the claim.

This same rationale also defeats Defendants' attempt to rely on principles of judicial estoppel to bar Plaintiff from proceeding with his excessive force claim.  (Defs.' Reply 3.)  Plaintiff's admission during his plea hearing that he "attempt[ed] to incite some kind of disturbance," is not inconsistent with his position in this action that the officers' response to his admitted attempt to engage in disorderly conducted violated his constitutional right to be free from excessive force.  Surely admitting to an attempt to be disorderly does not give officers free rein to inflict whatever force they see fit to contain that attempt.  In fact, Sergeant Nuckolls conceded that although they may have been disorderly, nothing that either Allen or Plaintiff did inside the lobby of the jail would have justified the use of any force and "the real incident" didn't begin until they were outside the building.  Nuckolls Dep. 39-40.  Sergeant Nuckolls also admitted that, once outside the building, had Plaintiff and Allen merely turned around and faced officers yelling about their rights without adopting some type of aggressive posture, the use of pepper spray on them would not have been

justified.  Nuckolls Dep. 54.  Nuckolls' testimony also reveals that Plaintiff did nothing more than

that - he was following Allen and "closing the gap."  *Id*. at 55.  There is no evidence that Plaintiff,

as opposed to Allen, assumed any type of aggressive posture or in any way threatened the officers -

either in the lobby of the jail or once outside the building.  In fact, at his plea hearing, it was clarified

on the record that Plaintiff did not plead guilty to actually engaging in disorderly conduct but only

to *attempting* to do so.  (Plea Tr. 4.)  Nothing in Plaintiff's plea operates to estop his excessive force

claim as a matter of law.

## C.     Nuckolls is Not Entitled to Summary Judgment on Plaintiff's Excessive Force Claim[2]

 In analyzing claims of excessive force, three factors guide the Court's analysis of the first

prong of the qualified immunity analysis - whether a constitutional right has been violated: "'[(1)]

the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety

of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest

by flight.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (*quoting*

*Graham*, 490 U.S. at 396, 109 S.Ct. 1865).  These factors are assessed from the perspective of a

reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly

evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97, 109

S.Ct. 1865.

Each of these factors, as the Supreme Court very recently reiterated in *Tolan, supra*, must

be analyzed in the light most favorable to the non-moving party. In the context of a qualified

---

[2] As mentioned *supra*, at the hearing on their motion for summary judgment, Defendants withdrew
the motion as to Deputies Nickelsen and Muldoon and Sergeant Guest in light of the factual dispute
raised by the deposition testimony of Allen and his girlfriend, Rose Ashby.

immunity analysis, this directive applies regardless of which prong of the qualified immunity analysis is under analysis, i.e. regardless whether the court is examining whether or not a constitutional right was violated or whether that right was clearly established at the time. "Courts have discretion to decide the order in which to engage in these two prongs. But under either prong, courts may not seek to resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866 (internal citation omitted).

In this case, analyzing the first prong, the severity of the "crime" - attempted disorderly conduct by a private citizen (not a detainee or even a releasee) in the lobby of and just outside the county jail - was minimal to non-existent. As to the threat posed by Allen and the Plaintiff once they followed orders to leave the jail lobby, Deputy Muldoon testified that once individuals leave the building, they are no longer a threat or a problem. Muldoon Dep. 14. Although Plaintiff did have a small hammer in his pocket that he carried with him for personal protection, none of the officers was aware of this fact when they followed Allen and Plaintiff outside. None of the officers testified that Plaintiff verbally or physically threatened them in any way. Viewing the facts in the light most favorable to the Plaintiff, when he was pepper sprayed without verbal warning, he was not resisting arrest or attempting to evade arrest by flight. Allegedly, he was moving toward officers not away from them. After being sprayed, Plaintiff claims that he was not resisting arrest and in fact was just lying on the ground trying to protect himself when officers continued beating, kicking and punching him after having deployed pepper spray directly in his face. An analysis of the *Graham* factors on Plaintiff's version of the facts surrounding the pepper spray incident suggests minimal severity of the crime, no immediate threat to safety and no active resistance or attempt to evade arrest.

Nuckolls delivered a burst of pepper spray to Plaintiff's face, when, according to Nuckolls,

31

Allen, not Plaintiff, took a clenched fist stance, started shouting obscenities and declaring that this was a free country and closed the "reactionary gap" between himself and Nuckolls. Nuckolls deployed his pepper spray, striking both Allen and Plaintiff in the face. Nuckolls concedes that no verbal warning was issued before he deployed his pepper spray. Nickelsen testified that in this same time frame, Allen and Plaintiff were 10 feet away and when they turned back toward officers he, Nickelsen, gave Allen several orders to stop advancing, which Allen ignored. Nickelsen Dep. 32. Muldoon also testified that he gave several verbal commands to Plaintiff to stop after Allen and Plaintiff turned back toward officers. Muldoon Dep. 33-35. Nickelsen and Muldoon's testimony that they had time to issue several verbal orders to Allen and Plaintiff to stop advancing casts doubt on Nuckolls' testimony that he had no time to give a verbal warning regarding his use of pepper spray.

When crediting Plaintiff's version of events, as the Court must on summary judgment, once outside the jail, Plaintiff and Allen turned back toward the group of officers and Allen simply said "at least you could have given him his hat and gloves," with which officers "started macing them." (Pl.'s Dep. 105.) Allen testified that he was walking to the car when one of the officers said "hey" and Allen turned around and immediately was sprayed in the face with mace. Viewing the facts in the light most favorable to the Plaintiff, Nuckolls use of pepper spray under these circumstances was objectively unreasonable. Nuckolls himself conceded that, once outside the building, had Plaintiff and Allen merely turned around and faced officers yelling about their rights without adopting some type of aggressive posture, the use of pepper spray on them would not have been justified. Nuckolls Dep. 54. Nuckolls' testimony also reveals that Plaintiff did nothing more than that - he was only following Allen who was "closing the gap." *Id*. at 55. There is no evidence that Plaintiff, as

opposed to Allen, assumed any type of aggressive posture or in any way threatened the officers - either in the lobby of the jail or once outside the building.  And, viewing the facts in light most favorable to the Plaintiff, Allen only turned and made verbal comments to the officers when both he and Plaintiff were "immediately maced" in the face.  Nuckolls' testimony concedes that on this version of the facts, his use of pepper spray on Allen and the Plaintiff was objectively unreasonable.  Moreover, Muldoon's testimony that "once they leave the building, they are no longer a threat to us," creates a question of fact regarding the reasonableness of the officers' decision to continue to follow Plaintiff and Allen outside the building once the threat had been diffused by their compliance with requests that they leave the building.  This conflicting testimony creates questions of fact regarding the nature and immediacy of any threat posed by Allen and/or Plaintiff after they had been escorted from the building.

Long before February 12, 2011, and at least as early as "2006, the principle of law was already clearly established that use of pepper spray on an arrestee who was not accused of a serious crime, was not posing an immediate threat to the safety of the officer or others, and was not actively resisting arrest or seeking to flee is constitutionally unreasonable."  *Howard v. Wayne County Sheriff's Ofc.,* 417 F. App'x 465, 471 (6th Cir. 2011).  *See also Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) ("An officer has use[d] excessive force when he pepper sprays a suspect who has not been told []he is under arrest and is not resisting arrest.") (citing Sixth Circuit precedent from 2004 and 1994).  Viewing the facts in the light most favorable to the Plaintiff, he had committed no crime or at most had attempted to disturb the peace, had not been informed he was under arrest, was not resisting arrest and posed no threat to officers when Nuckolls decided to pepper spray him in the face without warning.  "[A]pplying the three Graham factors—severity of the crime, immediate

threat to officers or others, and actively resisting arrest or trying to flee—[Nuckolls'] conduct was not objectively reasonable when the facts are viewed in a light most favorable to [Plaintiff]." *Grawey*, 567 F.3d at 311. Accordingly, Nuckolls is not entitled to qualified immunity on Plaintiff's claim that deploying pepper spray in Plaintiff's face was an act of excessive force.

###### D.   Zofchak and Becher are Entitled To Summary Judgment on Plaintiff's Claim Based Upon An Alleged Failure to Intervene But Nuckolls Is Not

"As a general matter, [an officer's] mere presence during [an] altercation, without a showing of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475. If an officer does not directly participate in the challenged conduct, "there must be a showing that they either supervised the [officers] who did so or owed [the plaintiff] a duty of protection." *Id*. To establish that an officer not directly involved owed a duty of care, it must be shown that the officer "'observed or had reason to know that excessive force would be or was being used'" and "'had both the opportunity and the means to prevent the harm from occurring.'" *Id*. (quoting *Turner*, 119 F.3d at 429.) In determining whether an officer had both the opportunity and the means to intervene, the Court must determine that the incident being challenged lasted long enough for the officers to "both perceive what was going on and intercede to stop it." *Id*. "[O]fficers cannot be held liable under this theory if they do not have 'a realistic opportunity to intervene and prevent harm.'" *Wells v. City of Dearborn*, 538 F. App'x 631, 640 (6th Cir. 2013) (quoting *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007)).

As to the alleged failure of any of the officers to intervene in Nuckolls' deploying of pepper spray, Plaintiff has presented no evidence on which the Court could conclude that any of the officers had either the opportunity or the means to intervene to stop Nuckolls from deploying his pepper spray. Nuckolls testified that he gave no verbal warning that he was going to deploy his pepper

spray and the single burst lasted only a few seconds.  There is simply no evidence that any of the officers had time enough to appreciate what Nuckolls was planning to do and had the opportunity to intervene to prevent Nuckolls from deploying his pepper spray.  Such a "rapid sequence of events" does not present a sufficient amount of time to hold an officer liable for failure to intervene.  *Ontha*, 222 F. App'x at 506.  Thus, Plaintiff has failed to create a genuine issue of material fact that any of the officers had either the opportunity or the means to intervene to prevent Nuckolls from deploying his pepper spray.  Accordingly, the officers are entitled to summary judgment on Plaintiff's claims that they failed to intervene to stop this particular alleged act of excessive force.

Defendants Zofchak and Becher move for summary judgment on Plaintiff's claims that they failed to intervene to prevent the acts of excessive force allegedly committed by Nickelsen, Muldoon and Guest when taking Plaintiff to the ground and allegedly beating, punching and kicking him.  Because Nickelsen, Muldoon and Guest have withdrawn their motion for summary judgment relating to these events, the Court is not called upon to rule on the viability of these excessive force claims.  However, assuming for the sake of argument that Plaintiff is able to prove that Nickelsen, Muldoon and Guest used excessive force in taking Plaintiff down and securing him in handcuffs, Plaintiff has failed to create a genuine issue of material fact that either Zofchak or Becher could have intervened to stop the alleged beating by Nickelsen, Muldoon and Guest.  The only evidence regarding Zofchak and Becher's conduct following Nuckolls decision to deploy his OC spray substantiates their claim that they both were singularly and exclusively engaged with Allen at the same time that Nickelsen, Muldoon and Guest struggled with Plaintiff.  Even viewing the facts in the light most favorable to the Plaintiff, Zofchak and Becher were "too focused on the task at hand

35

to notice what the other officers were doing." *Sheffey v. City of Covington*, __F. App'x__, 2014 WL 1663063, at *9 (6th Cir. 2014) (finding no liability on a failure to intervene claim where the two officers were engaged in a struggle that prevented them from being free to intervene to stop the allegedly excessive tasings by fellow officers).

Becher testified that immediately after the OC spray was administered by Nuckolls, Becher was the first person to physically contact Allen. Becher Dep. 28. He delivered peroneal knee strikes to Allen which had little effect and then he and Nickelsen struggled to get Allen's hands behind his back. At this point, Zofchak, who had just come out the lobby doors, went directly to assist Becher and Nickelsen by placing a knee in Allen's back. *Id*. at 29-30. Becher was completely unaware of what was going with Plaintiff as he was engaged in his own struggle with Allen. *Id*. at 31. Similarly, when Zofchak came out of the building, he observed the altercation with Allen and went straight to assist Becher with Allen. Zofchak Dep. 17. Zofchak paid no attention to Plaintiff and went directly to help Becher secure Allen. *Id*. at 17. He did not know where Plaintiff was and "wasn't paying attention to [Plaintiff] at all." *Id*. at 21.

In response to Defendants' motion for summary judgment on these failure to intervene claims, Plaintiff offers no evidence that would create a genuine issue of material fact that either Zofchak or Becher had the opportunity (i.e. observed excessive force being applied to Plaintiff) and the means (were able to intervene) to stop Nickelsen, Muldoon and Guest, assuming for purposes of argument only that they were engaged in acts of excessive force against Plaintiff. Accordingly, Zofchak and Becher, who are not claimed to have been personally involved in any way with the alleged acts of excessive force against the Plaintiff, are entitled to summary judgment on Plaintiff's only claims against them, i.e. a failure to intervene.

Nuckolls, on the other hand, was not engaged physically with Allen after he administered the OC spray and was observing Muldoon and Guest "struggling with Plaintiff" on the ground and observed Nickelsen join in the struggle with Plaintiff after Nickelsen assisted in bringing Allen under control.  Nuckolls Dep. 49.  Nuckolls testified that he did not see Plaintiff taken to the ground but was able to observe the struggle and did not recall seeing any of the officers punch, hit or kick the Plaintiff.  *Id.* at 49-50.  Nuckolls observed Plaintiff "being resistant to the handcuffing process." *Id.* at 56.  While Nuckolls believed the whole incident he observed took less than 20 seconds, *id.* at 51-52, the events he describes having witnessed suggest a more appreciable amount of time passed. Nuckolls testified that he observed Plaintiff "resisting" officers' efforts to handcuff him and further observed Nickelsen, who had first been involved with bringing Allen under control, move to assist Muldoon and Guest with Plaintiff.  In any event, crediting Plaintiff's testimony as the Court must on summary judgment, the beating he describes having endured lasted longer than 20 seconds and thus there is a question of fact regarding whether Nuckolls, who testified that he observed the struggle between Plaintiff and Nickelsen, Muldoon and Guest, had the opportunity to observe the alleged beating and stood idly by when he had sufficient opportunity to intervene to stop it.  "[A] police officer cannot stand idly by if he observes the use of excessive force and has the means and opportunity to prevent it."  *Ontha*, 222 F. App'x at 507 (citing *Turner*, 119 F.3d at 425.)  The evidence presented, viewed in the light most favorable to the Plaintiff, suggests that Nuckolls, a supervisor and twenty-year veteran at the jail, observed Nickelsen, Muldoon and Guest struggle with Plaintiff and was not otherwise occupied.  Assuming for the sake of argument that Nickelsen, Muldoon and Guest's actions (which are not before the Court on summary judgment) constituted excessive force, Plaintiff has presented sufficient evidence to create a genuine issue of material fact

37

as to whether there was sufficient time and opportunity for Nuckolls to have intervened to prevent the alleged acts of excessive force.   Accordingly, Nuckolls is not entitled to summary judgment on Plaintiff's claim that he failed to intervene to prevent the alleged beating by Nickelsen, Muldoon and Guest.

### E.    Nuckolls is Not Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim[3]

In Michigan, to recover under an assault theory, a plaintiff must show: (1) an intentional unlawful offer of corporal injury to another by force, or force unlawfully directed toward the person of another; (2) under circumstances which creates a well-founded apprehension of imminent contact; (3) coupled with the apparent present ability to accomplish the contact. *VanVorous v. Burmeister*, 262 Mich. App. 467 (2004). Battery is a "wilful and harmful or offensive touching of another person, which results from an act, intended to cause such a contact." *Id.* (internal quotation marks omitted). Michigan courts apply the objective reasonableness standard for excessive force claims under § 1983 in determining whether an officer has committed an assault and battery.  *Wells*, 583 F. App'x at 641 n. 3 (citing *VanVourous*, 262 Mich. App. at 483 ).

Because, when viewing the facts in the light most favorable to Plaintiff, the Court concludes that a reasonable trier of fact could conclude that Nuckolls' use of pepper spray against Plaintiff constituted force that was not objectively reasonable under the circumstances, the Court denies summary judgment on Plaintiff's assault and battery claims against Nuckolls to the extent those claims are based on that same conduct.  Nor is Nuckolls entitled to governmental immunity for these

---

[3]  As mentioned *supra*, Nickelsen, Muldoon and Guest are not moving for summary judgment on Plaintiff's claims of excessive force and assault and battery against them for their allegedly unconstitutional conduct in taking Plaintiff to the ground and allegedly beating him.

alleged acts of excessive force where his intent remains an issue of fact.  Even if officers are engaged in a discretionary, rather than a ministerial, act, a jury may find that they did not act in good faith and/or acted with malice. *See Odom v. Wayne County*, 482 Mich. 459, 474-75.  (2008).  *See also Malory v. Whiting*, No. 11-1468, 2012 WL 2874033, at *8 (6th Cir. July 13, 2012) (noting that "[t]he question of an officer's good faith under Michigan law overlaps considerably, if not entirely, with our analysis of whether the officer's actions were objectively reasonable under the circumstance," and finding a genuine issue of material fact regarding the officer's good faith precluded summary judgment on grounds of governmental immunity).  Because reasonable jurors could conclude that Nuckolls' use of pepper spray on Plaintiff was objectively unreasonable, reasonable jurors could also conclude that Nuckolls did not act in good faith but instead pepper sprayed Plaintiff "*maliciously* or with a *wanton or reckless disregard of the rights of another*." *Odom*, 482 Mich. at 474 (emphasis in original).  Accordingly, Nuckolls is not entitled to summary judgment on Plaintiff's assault and battery claim.

### F.    Zofchak, Becher, Muldoon, Nickelsen and Guest are Entitled to Summary Judgment on Plaintiff's Gross Negligence Claim But Nuckolls Is Not

"Government employees can also be held liable for gross negligence under Michigan tort law. Mich. Comp. Laws § 691.1407(2)(c). Gross negligence is defined by statute as 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'"  Mich. Comp. Laws. § 691.1407(7)(a)." *Wells*, 538 F. App'x at 641.  While Nickelsen, Muldoon and Guest have withdrawn their motion for summary judgment on Plaintiff's claims of excessive force and assault and battery, they maintain their motion as to Plaintiff's claims of gross negligence against them.  Because Plaintiff's claims of gross negligence against Nickelsen, Muldoon and Guest are based on the same conduct that forms the basis of his excessive force and assault and battery claims

against these Defendants, they are entitled to summary judgment on Plaintiff's gross negligence claims against them. *See Wells*, 538 F. App'x at 641-42. "[U]nder Michigan law, Wells cannot bring a gross-negligence claim that is premised on Mueller's alleged assault and battery of Wells [as] Michigan courts have repeatedly 'rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'" (quoting *VanVorous*, 687 N.W.2d at 143).

Plaintiff claims that Zofchak and Becher, whom Plaintiff concedes had no physical contact with him, were grossly negligent in failing to intervene to prevent Nickelsen, Muldoon and Guest from beating Plaintiff. However, because the Court concludes that, even assuming Plaintiff ultimately establishes that Nickelsen, Muldoon and Guest utilized excessive force in placing Plaintiff under arrest, Zofchak and Becher are entitled to summary judgment on Plaintiff's failure to intervene claims against them, no claim for gross negligence can lie against them. *See Wells*, 538 F. App'x at 642 (finding no basis for a gross negligence claim under Michigan law where plaintiff did not establish a failure to intervene). Therefore, Zofchak and Becher are entitled to summary judgment on Plaintiff's claim of gross negligence.

With regard to Nuckolls, the Court has concluded, viewing the facts in the light most favorable to the Plaintiff as it must do at this stage, that Plaintiff's claims of excessive force and assault and battery against Nuckolls for the pepper spray incident survive summary judgment. Plaintiff cannot maintain a gross negligence claim against Nuckolls based upon the same conduct that forms the basis for his assault and battery claim. *See Wells*, 538 F. App'x at 641-42. "[U]nder Michigan law, Wells cannot bring a gross-negligence claim that is premised on Mueller's alleged assault and battery of Wells [as] Michigan courts have repeatedly 'rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'" (quoting

40

*VanVorous*, 687 N.W.2d at 143).   Accordingly, Nuckolls is entitled to summary judgment on Plaintiff's gross negligence claim as it relates to the pepper spray incident.

Because the Court concludes that genuine issues of fact remain as to whether Nuckolls failed to intervene to prevent Nickelsen, Muldoon and Guest from engaging in acts of excessive force against Plaintiff, a question arises as to whether Nuckolls is entitled to summary judgment on Plaintiff's gross negligence claim based upon this alleged failure to intervene.   Plaintiff argues that such a claim was recognized by the court in *Philpott v. City of Portage*, No. 05-cv-70, 2006 WL 2385316 (W.D. Mich. Aug. 17, 2006).   To sustain a gross negligence claim, Plaintiff must present evidence that the defendant was grossly negligent, i.e. engaged in conduct that was "so reckless as to demonstrate a substantial lack of concern for whether injury results," and that the gross negligence is the proximate cause of the injury or damage.   Mich. Comp. Laws § 691.1407(2).   The phrase "the proximate cause" as used in the statute means "the one most immediate, efficient, and direct cause preceding an injury."   *Robinson v. City of Detroit*, 462 Mich. 439, 458-59 (2000).

Plaintiff in *Phillpot* asserted claims of excessive force, assault and battery and gross negligence, all premised upon allegedly excessively tight handcuffs.   Plaintiff claimed that applying the handcuffs too tight constituted excessive force and assault and battery under state law and that the failure to intervene to loosen them constituted gross negligence. 2006 WL 2385316, at *3.   One of the defendant officers in *Phillpot* who was at the scene but did not handcuff plaintiff, arrest her or otherwise interact with her moved for summary judgment, claiming that he was not the proximate cause of her injuries.   The court concluded that although not directly involved with plaintiff, the officer could nonetheless be the proximate cause of her injuries if he heard her complaints and failed to act to determine whether they were too tight "because he could have prevented those injuries by

41

adjusting or removing the handcuffs." *Id*. at *7.  The Sixth Circuit has twice observed that this theory of liability was recognized in *Philpott* but declined to apply it in both instances.  *See Smith v. County of Lenawee*, 600 F.3d 686, 692 (6th Cir. 2010) (recognizing but distinguishing *Philpott* where the defendant officer was not an employee of the defendant county and had been only peripherally involved in plaintiff's care); *Wells*, 538 F. App'x at 643 (distinguishing *Philpott* where defendants had no opportunity to intervene to prevent the harm).  The Sixth Circuit's dicta in *Wells* would seem to suggest that a gross negligence claim could lie where plaintiff could establish a constitutional claim based upon a failure to intervene that was the proximate cause of plaintiff's injuries.  The burden to raise and prove entitlement to immunity falls on the governmental employee seeking to assert it as an affirmative defense.  *Odom*, 482 Mich. at 479.  Defendants have failed to address in any meaningful way Plaintiff's argument that Nuckolls could have, but did not, intervene to prevent Nickelsen, Muldoon and Guest from punching, kicking and beating Plaintiff.  Accordingly, viewing the facts in the light most favorable to the Plaintiff, the Court must deny Nuckolls' motion for summary judgment on Plaintiff's gross negligence claim based upon Nuckolls' alleged failure to intervene to prevent the injury to Plaintiff allegedly suffered by the acts of excessive force of officers Nickelsen, Muldoon and Guest.

While Plaintiff appears to direct his gross negligence claim to the actions of the individual officers and does not appear to assert his gross negligence claim against the County, it is well established under Michigan law "'that the management, operation and control of a police department is a governmental function and that tort actions against a municipality based on the negligence of its police officers, occurring while the officer is engaged in a discharge of that function, are barred by the doctrine of governmental immunity.'" *Garretson v. City of Madison Heights*, 407 F.3d 789,

42

800 (6th Cir. 2005) (quoting *Moore v. City of Detroit*, 128 Mich. App. 491, 340 N.W.2d 640, 643

(1983)).  Genesee County would be entitled to summary judgment on a gross negligence claim.

### G.      Genesee County is Entitled to Summary Judgment on Plaintiff's *Monell* Claim

A municipality can be held liable under § 1983 where it is shown that a municipal custom

or policy is the driving force behind the alleged constitutional violation.  *See Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 694 (1978) (stating that the drafters of § 1983 intended only to impose liability

on a government that "causes" an employee to violate another's rights under color of some official

policy).  To prevail in such a suit, the plaintiff must show that the alleged violation of his federal

rights was caused by a municipal policy or custom.  *Thomas v. City of Chattanooga*, 398 F.3d 426,

429 (6th Cir. 2005).  A plaintiff asserting a § 1983 claim on the basis of municipal custom or policy

must identify the policy, connect the policy to the municipality, and show that the specific injury at

issue was caused by the execution of that policy.  *Graham v. County of Washtenaw*, 358 F.3d 377,

383 (6th Cir. 2004).  The causal link must be strong enough to support a finding that the defendants'

deliberate conduct can be deemed the "moving force" behind the violation.  *Id.* (quoting *Waters v.*

*City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

In *Thomas*, the Sixth Circuit identified four ways in which a plaintiff may prove the

existence of an illegal policy or custom.  398 F.3d at 429.  The plaintiff can point to (1) the

government's legislative enactments or official policies; (2) actions by officials with final decision-

making authority; (3) a policy of inadequate training or supervision; or (4) a custom or practice of

tolerating the violation of federal rights by its officers or agents.  *Id.*  Where no formal policy exists,

the critical inquiry is whether there is a policy or custom that although not explicitly authorized "is

so permanent and well settled as to constitute a custom or usage with the force of law."  *Jones v.*

*Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)).  A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 on a theory of *respondeat superior*.  *Monell*, 436 U.S. at 691-95; *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

To succeed on a claim for failure to supervise or train, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendants' deliberate indifference; and (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

The record contains absolutely no evidence that "the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Sanilac County*, 606 F.3d at 255.  *See also Burgess*, 735 F.3d at 478-79 (finding that plaintiff failed to demonstrate the existence of prior instances of similar misconduct demonstrating that the defendant was on notice that its training and supervision in the particular area being

44

challenged was deficient); *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) ("'To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'") (quoting *Sanilac County*, *supra*) (alteration in original); *Hearon v. City of Ferndale*, No. 11-14481, 2013 WL 823233, at *16 (E.D. Mich. March 6, 2013) (finding that plaintiff failed to establish deliberate indifference where there was no evidence of prior instances of unconstitutional conduct demonstrating that the City had "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury").

Plaintiff has not even endeavored to marshal evidence that the County was on notice of similar of instances of Genesee County Sheriff's deputies engaging in similar acts of excessive force that would have put the County on notice for the need for further training that the County has ignored. At the hearing on Defendants' motion, perhaps recognizing this evidentiary failure, Plaintiff's counsel did not address the *Monell* claim and chose to rely on his brief, which contained two paragraphs of legal argument with citation to record evidence regarding the amount of training the Defendants had received on the use of excessive force. Plaintiff concludes in his brief that based on this allegedly deficient training, "it is obvious" that the County does not adequately train its officers with regard to the use of force. *Burgess*, *Sanilac County*, *Savoie* and other Sixth Circuit precedent establishes that to sustain a failure to train claim, Plaintiff must present much more. Plaintiff produced no evidence regarding prior instances of similar misconduct demonstrating that the County was on notice that its training and supervision in this particular area was deficient. Without such evidence, Plaintiff's deliberate indifference claim must fail. Accordingly, Genesee

County is entitled to summary judgment on any claim of *Monell* liability premised upon the alleged

failure to adequately train its officers with regard to the use of force.

## IV.    CONCLUSION

For the foregoing reasons, the Court:

1)    DENIES Nuckolls' Motion for Summary Judgment on Plaintiff's claims of excessive force and assault and battery based upon the pepper spray incident;

2)    DENIES Nuckolls' Motion for Summary Judgment on Plaintiff's claims of failure to intervene and gross negligence based upon the alleged failure to intervene to prevent Nickelsen, Muldoon and Guest from engaging in acts of excessive force against Plaintiff;

3)    GRANTS Nuckolls' Motion for Summary Judgment on Plaintiff's claims of gross negligence based upon the pepper spray incident;

4)    GRANTS Nickelsen, Muldoon, Guest and the County's Motion for Summary Judgment on Plaintiff's gross negligence claims;

5)    GRANTS Zofchak and Becher's Motion for Summary Judgment and DISMISSES them from this action; and

6)    GRANTS Genesee County's Motion for Summary Judgment based upon an alleged policy or custom and DISMISSES the County from this action.

The case will proceed to trial against Nuckolls, Nickelsen, Muldoon and Guest on Plaintiff's

claims of excessive force and assault and battery and against Nuckolls on Plaintiff's claims of failure

to intervene and gross negligence for failure to intervene.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 6, 2014

46

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 6, 2014.

s/Deborah Tofil
Case Manager